*In re* ESTATE OF GEORGE A. DZIALOWY, Deceased.—(SAMUEL J. BETAR, Adm'r of the Estate of George A. Dzialowy, Deceased, Petitioner-Appellee, *v.* STEVEN DZIALOWY *et al.*, Respondents-Appellants.)

First District (3rd Division)    No. 77-178

Opinion filed October 5, 1977.

Thomas J. Georgis, Ltd., of Hickory Hills, for appellants.

Barry A. Feinberg, of Chicago, for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

On May 28, 1976, Samuel J. Betar, the Public Administrator and the administrator of the estate of George A. Dzialowy, deceased, brought this recovery citation action in the probate division of the circuit court of Cook County. The administrator claimed that the deceased during his lifetime and marriage to Henrietta Dzialowy had made transfers of certain assets to Steven, William, and Joseph Dzialowy, the deceased's sons, in fraud of the surviving spouse's marital rights. On November 5, 1976, the trial court, after hearing evidence, ruled in favor of the administrator and ordered respondents to return certain assets and

property to the estate. Originally, the three sons appealed. However by stipulation the appeal has been dismissed as to Joseph and William Dzialowy as appellants upon condition that each of them pay $8,000 to the administrator. Consequently, the respondent Steven Dzialowy remains as the only appellant. The three sons were by the deceased's first wife. The deceased's widow, Henrietta, has been incompetent and resides at a nursing home in Wisconsin.

The assets and property at issue consist of $2,586.25 in a checking account which had been in the First National Bank of Stevens Point, Wisconsin; $25,306.52 which had been in a Payable On Death account in the First Financial Savings and Loan Association in Wisconsin; $25,650.15 as the proceeds from the sale of the deceased's home in Wisconsin; and certain of the deceased's furniture and $495 from the sale of furniture in that home.

At the citation hearing, Helen Edgett, assistant director of nursing at the Brentwood Nursing Home in Oak Lawn, Illinois, testified that the deceased was brought to the nursing home as a patient on September 5, 1975. He was there until September 17, 1975, when he was transferred to an Oak Lawn hospital where he died on September 23, 1975. During the deceased's stay at the nursing home, the witness saw him every day. She believed him to be competent and able to conduct his affairs. She was aware that he had had a stroke earlier in 1975, but at the nursing home the deceased was being treated only for a prostate condition and a swelling of the ankles.

Steven Dzialowy testified that he was 61 years old. His father, the deceased, had moved to Wisconsin 15 years before his death when he retired at 65 years of age. Steven and his brother had driven the father to Steven's home on September 4, 1975, and on the following day had taken him to a nursing home. His father's mental condition was satisfactory, and he was able to handle his own affairs.

As to the deceased's checking account of $2,586.25, Steven believed that the deceased opened it about three years before his death. On September 2, 1975, Steven's name was added to the account. Steven testified he informed his father: " 'Pa, I'm getting tired of going to your bedside and having you sign the checks. It's about time I was able to write the checks because I have got to do all the running around town,' and pay his bills." When asked if his father said anything, Steven replied that he did not but that he signed the card. Steven withdrew all but $117 in the account. When he was advised by the bank that no checks were outstanding, Steven withdrew the $117.

With respect to the P.O.D. account of $25,306.52 in the Wisconsin savings institution, it was opened on April 19, 1974, in the name of the deceased, payable on his death to his three sons. Steven testified that on or

about September 1, 1975 his brother Joseph and he went to Wisconsin. They visited the bank and asked Mr. John Seramur, a bank officer, if they could withdraw the money from the account. Seramur replied that he would have to see their father. They directed him to the Wisconsin hospital where the father was a patient. Seramur visited the father and told Joseph that they could withdraw the money from the P.O.D. account on the following day because their father had authorized it. The father had signed a card presented to him by Seramur. On the following day Steven and Joseph went to the bank and received three checks: one for each brother. Steven testified that he earlier had a conversation with his father about the P.O.D. account and the latter agreed to transfer it to his three sons.

With regard to the sale of the deceased's home in Wisconsin, the contract for that sale was signed in July, 1975, and the deal was closed on August 29, 1975. In July 1975, the father also had signed a contract to buy another home in Wisconsin, but that contract was cancelled. No reason for the cancellation appears in the record. It was stipulated by both sides that by order of a Wisconsin probate court $14,000 out of the proceeds of the sale were paid to the guardian of the estate of Henrietta as the latter's dower interest. After the payment of the foregoing amount plus fees and costs, a balance of $28,650.15 remained. This amount consisted of a check payable to the father. Steven testified that his brothers and he took the check to his father's bedside. Steven said: "Pa, sign the check." They had no conversation, but the father signed the check and returned it to them. On the next day Steven and William took the check to a bank in Burbank, Illinois, and as per their three-way agreement each of the brothers took one-third of the money. Steven subsequently testified that the father agreed to it.

As to the furniture in the father's home, Steven sold a bedroom set for $200 and another bedroom set, plus a washer and dryer, for $295. Steven retained the money. His father had been urging friends to take pieces of furniture in the home. Steven brought the rest of the furniture, not identified in the record, to his home in Burbank, Illinois.

Respondent initially contends that the circuit court of Cook County has no jurisdiction over the subject estate. Respondent argues that the deceased's residence and assets were located in Wisconsin, and that only that State has jurisdiction.

■■■ In *Hughes v. Illinois Public Aid Com.* (1954), 2 Ill. 2d 374, 118 N.E.2d 14, the court enunciated the principle that "residence" is made up of two elements: bodily residence in a place, and the intention of remaining there. Since bodily presence of the deceased in Illinois at the time of his death is undisputed, we are concerned solely with the deceased's intent to remain in Illinois. The burden was upon the

respondent to show that his father intended to return to Wisconsin. (See *Greenberg v. Neiman* (1943), 320 Ill. App. 99, 49 N.E.2d 817.) The only evidence in the record points to a contrary conclusion. The respondent testified that not only did the deceased sell his home, but he also disposed of its contents. The deceased also cancelled a contract to purchase another home in Wisconsin. These circumstances indicate an intent to abandon the Wisconsin residence. Moreover, neither side suggests that the deceased did not possess his mental faculties. Hence it may be presumed that he was aware of his physical condition and the fact that he required daily care. Since any inferences to be drawn from the record are in favor of a finding that the deceased resided or was domiciled in Illinois at the time of his death and since the respondent failed to produce any contradictory evidence, it cannot be said that the trial court's exercise of jurisdiction was improper.

The respondent next argues that the trial court erred in holding that the joint tenancy checking account of $2,586.25 was not a valid inter vivos donative transfer to the respondent.

The transfer of personal property into joint tenancy with right of survivorship creates a presumption of the existence of a present donative intent on the part of the donor-joint tenant, which presumption can be overcome only by clear and convincing evidence to the contrary. (*In re Estate of Pokorney* (1968), 93 Ill. App. 2d 174, 236 N.E.2d 396.) Moreover, only evidence that the transfer was made for the mere convenience of the donor-joint tenant will constitute clear and convincing evidence to the contrary. *In re Estate of Elliott* (1975), 33 Ill. App. 3d 1046, 339 N.E.2d 378.

■■ In the instant case, it is apparent from respondent's own testimony that his name was added to the checking account solely for the convenience of the father in the latter's belief that it was necessary to have his bills paid. Respondent's name went on the account only when he informed his father that he was "tired of running around town." This testimony clearly revealed that the transfer was made solely for the convenience of the donor-joint tenant. Hence the presumption of the existence of a present donative intent was overcome by clear and convincing evidence to the contrary. The trial court correctly so ruled.

The respondent next contends that the trial court erred in holding that the sum of $25,306.52 in the deceased's account payable on death to the three sons and delivered to them by checks prior to the deceased's death was transferred to defraud the marital rights of the surviving spouse and did not constitute a valid inter vivos gift.

■■ Insofar as the statutory marital right is concerned, the owner and now deceased spouse, in the lifetime of both spouses, has the absolute right actually and really to dispose of his property in any manner he sees

fit without the concurrence or even the knowledge of the now surviving spouse. He may do so even though he does it for the precise purpose of defeating the interest which the now surviving spouse would otherwise have obtained by reason of the statutory marital right. (*Haskell v. Art Institute of Chicago* (1940), 304 Ill. App. 393, 26 N.E.2d 736; *Milewski v. Milewski* (1953), 351 Ill. App. 158, 114 N.E.2d 419.) The only restriction on such a transfer is that it not be a sham or merely colorable because it lacks the essential element of donative intent. (*Toman v. Svoboda* (1976), 39 Ill.App. 3d 394, 349 N.E.2d 668.) In *Montgomery v. Michaels* (1973), 54 Ill. 2d 532, 301 N.E.2d 465, the court recited some attendant circumstances bearing upon the intent of the deceased donor-spouse in making the inter vivos donative transfer of legal title: the secretive manner in which the donor acted to the now surviving spouse; what the donor-spouse might have said to others as to his intent in making the apparent gift; the proximity in time between the donative transfer and the donor's death; the value of the donor's estate and the value of property otherwise left to the surviving spouse; and all factors which might be indicative of an intent to defraud the surviving spouse of a statutory share. The fraud referred to in *Montgomery* relates to the absence of a present donative intent. See *Toman v. Svoboda.*

■■  The elements of an inter vivos gift are donative intent; the giving up of exclusive dominion and control over the property; and delivery. (*Frey v. Wubbena* (1962), 26 Ill. 2d 62, 185 N.E.2d 850.) In establishing that a gift was made the burden of proof is upon the party claiming a gift of property from a deceased person. (*Dudley v. Uptown National Bank of Moline* (1960), 25 Ill. App. 2d 514, 167 N.E.2d 257.) The creation of a P.O.D. account is a clear manifestation of the donative intent to make a valid gift to the donee. *Dudley v. Uptown National Bank of Moline.*

■■  In the present case, the deceased manifested evidence of his donative intent as far back as April 19, 1974 when he created the P.O.D. account and named as donees, his three sons. Then, early in September 1975, two of the sons inquired at the bank if they could withdraw the money from the account. They were informed that a bank officer would have to see the father. On the following day, a bank officer did visit the father and received necessary authorization from him to deliver the proceeds of the account to the sons. Additionally, Steven testified that earlier his father had expressed his intention of transferring the account to his sons. All the elements of a gift were demonstrated. We believe that the trial court erred in holding that the transfer of the P.O.D. account was not a valid inter vivos gift.

■■ ■  In our view, however, the trial court, under the facts and circumstances of this case, correctly determined that respondent had failed to meet his burden of establishing that the deceased made a valid

inter vivos gift of the proceeds of his Wisconsin residence. The record discloses that the sons went to the father's bedside with the check constituting the proceeds. Steven then said: "Pa, sign the check." Without any conversation the father signed the check. Steven testified that pursuant to an agreement among his brothers and himself they divided the proceeds in three equal shares. Respondent has conceded in his brief that: "No language was exchanged" between the father and the sons with regard to these proceeds. This concession is made despite the wide latitude afforded respondent's counsel by the trial judge to elicit from Steven any such conversation. The respondent argues, instead, that a gift should be implied because the father signed the check. His reliance for that proposition upon the case of *Haskell v. Art Institute of Chicago* (1940), 304 Ill. App. 393, 26 N.E.2d 736, is misplaced. In that case, this court did uphold a gift made by a party who was ill and died shortly thereafter. However, the court held that a valid gift was established because there was clear and specific language between the donor and donee establishing the donor's intent. No language of any kind exists in the present situation. Moreover, the respondent testified that his brothers and he divided the proceeds of the home sale according to their own arrangement, certainly a clear indication that the deceased father had not expressed intent to make a gift of the proceeds. Additionally, the courts generally examine carefully the testimony of one who stands to gain the benefit of the gift. In the case of *In re Estate of Skinner* (1969), 111 Ill. App. 2d 267, 276, 250 N.E.2d 295, the court stated: "[T]he sole testimony of a donee as to what was done or said to him by a deceased donor is of questionable credibility and should be carefully scrutinized, as direct disproof of such declarations and conduct of the deceased donor is rarely possible." (Also see *In re Estate of Morys* (1973), 17 Ill. App. 3d 6, 307 N.E.2d 669.) Since the only evidence of what occurred at the time of the alleged gift is the respondent donee's testimony, the trial court properly could have given this evidence little weight. This is especially true here because, as we have already noted, the trial court gave respondent's counsel ample opportunity to elicit some positive testimony from respondent as to what was done and said at the time of the transfer. We conclude that the trial court correctly determined that the respondent failed to establish that a gift of the proceeds of the sale of the home had been made.

■■ The only testimony concerning the furniture and proceeds from the sale of furniture in the deceased's home reveals that the deceased urged unknown friends in Wisconsin to take part of the furniture. The respondent sold several items for a total of $495, keeping the proceeds, and took the rest of the furniture to his home in Illinois. The record

reveals a complete lack of proof as to the deceased's intent to make a gift to the respondent of any furniture or of the proceeds of the sale conducted by the respondent apparently without any authorization from the deceased.

For the reasons stated, the orders of the circuit court of Cook County directing the respondent to turn over to the administrator the proceeds of the checking account, the deceased's furniture and proceeds from the sale of certain furniture, and the respondent's share of the proceeds received from the sale of the deceased's home are affirmed. The order directing respondent to turn over to the administrator respondent's share of the proceeds from the P.O.D. account is reversed.

Affirmed in part; reversed in part.

JIGANTI and McGILLICUDDY, JJ., concur.