*In re* ESTATE OF AMELIA L. SCHROEDER, Deceased.—(WILLIAM S. METCOFF, Ex'r of the Will of Amelia L. Schroeder, Petitioner-Appellant, *v.* ELEANOR DEICHMAN, Respondent-Appellee.)

First District (2nd Division)   No. 78-1961

Opinion filed July 31, 1979.

L. Louis Karton, Ltd., and Marvin L. Goldberger, both of Chicago, for appellant.

John W. Golosinec, Chester J. Cross, and Walter M. Ketchum, all of Chicago, for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Petitioner, William Metcoff, executor of the will of Amelia L. Schroeder, deceased, appeals from an order of the circuit court of Cook County denying his citation-petition against respondent, Eleanor Deichman, which sought to recover the proceeds of joint savings and checking accounts at the Northwest National Bank of Chicago. On appeal, petitioner contends that the trial court erred (1) in finding that there was donative intent to create a joint tenancy in favor of respondent, and (2) when it failed to consider decedent's will.

It is undisputed that the savings and checking accounts were set up as joint tenancy accounts in compliance with the applicable statutes.

Petitioner, William Metcoff, an attorney, testified that occasionally he performed certain legal services for decedent. He had known decedent prior to 1973, and knew that she had relatives living outside Chicago. Decedent lived alone and was approximately 80 years of age at the time of her death. He stated that in 1969 both checking and savings accounts were opened in the name of decedent at the Northwest National Bank of Chicago. On March 12, 1973, decedent and respondent came to petitioner's office concerning preparation of decedent's Federal income tax return. Decedent told petitioner that she was going to have eye surgery and inquired whether someone could pay her bills when she was hospitalized. He told decedent that she should have someone placed on her savings and checking accounts as an "agent signatory." He said decedent asked if she could put respondent on her accounts and he told her that she would have to take respondent to the bank in order to change them. Respondent said that she and decedent had been good friends for many years and that she would take care of financial matters until decedent could handle her own affairs.

On April 5, 1973, decedent and respondent returned to petitioner's office about the tax matter and indicated to him that decedent was scheduled for eye surgery in two months. Decedent, as of this time, had not made arrangements to have respondent added as an additional party to the bank accounts. Petitioner said that he knew respondent's name was subsequently put on the accounts; however, he never saw the signature cards or bank records. Petitioner further stated that decedent's eyesight was poor and that he had to show her where to sign the completed tax return. In the early part of 1974 respondent came to petitioner's office and complained that she was having trouble with decedent and requested that her name be removed from the bank accounts since decedent was

imposing on her and taking too much of her time. Petitioner suggested that when decedent and respondent went to the bank, decedent should change the accounts over to single accounts. In the fall of 1975, respondent again made a similar request to petitioner to be removed from the accounts. Decedent died on November 25, 1975.

In December 1975, petitioner and respondent went to the bank and it was at this time that petitioner learned that the accounts were in joint tenancy. Both petitioner and respondent were present at the bank when petitioner learned the accounts were joint tenant accounts, and petitioner testified that respondent stated, "I did not know they were in joint tenancy."

On cross-examination, petitioner testified that he did not have records of these conversations with decedent or respondent and that respondent was a close companion of the decedent. He also stated that decedent's eyesight was reasonably normal in October 1973 after surgery was performed on her eyes.

On redirect examination, he testified that, as trustee of the estate of decedent's brother, he paid respondent approximately $335 for rendering personal services to decedent. Petitioner told respondent that he would pay any costs involved regarding the care of decedent after eye surgery. Petitioner said that, after he learned that the bank accounts were in joint tenancy, he told respondent that he "would have to take the position that they were the decedent's funds." On re-cross-examination, he testified that decedent wanted respondent to care for her after the eye surgery, and decedent told respondent that she would pay her if she would take time off her job to be with her.

Robert Leake, assistant vice-president of Northwest National Bank, testified that he had never met decedent and that the only time he talked with respondent was when she came to the bank to put a "hold" on the joint savings account. He also stated that when people convert an individual account into a joint savings account, the significance is not discussed unless the people ask for an explanation.

Ida Hesotian, a clerk for Northwest National Bank in 1975, testified that she did not notice anything unusual about the decedent. She did not recall the transaction, and the receipts that were made in the regular course of business had her initials on them.

Respondent testified that in the spring of 1973 she and decedent had a conversation with the petitioner at his office. Decedent there told petitioner that her eyes were in very poor condition, and asked if it was possible that she could put respondent's name on her bank accounts. Respondent testified on direct examination, "She [decedent] wanted someone to take—help her with her bank account because of her

eyesight, her vision." During the conversation at petitioner's office, nothing was mentioned concerning how the accounts should be handled, and in May 1973, petitioner gave his permission to have respondent's name put on the bank accounts. Respondent stated that decedent would always ask for petitioner's advice before making any decisions. Shortly thereafter, respondent and decedent went to the Northwest National Bank to have respondent's name added to the accounts. Respondent and decedent were given form cards at the bank, and decedent had the card read to her by an employee of the bank because of her poor eyesight.

Respondent testified that in the middle of 1974 she had a telephone conversation with petitioner. Decedent was with respondent during this time and participated in the conversation on an extension telephone at respondent's house. Respondent told petitioner that she wanted her name to be removed from the accounts because it was impossible for her to continue to go to the bank every time decedent requested her to go. Petitioner told her, "Well, if there is —anything happened, the account would be yours anyhow."

In September 1975, decedent transferred funds from her single account at another bank to the jointly owned account at the Northwest National Bank. Respondent stated that she and decedent consulted with petitioner on the telephone before transferring the funds and that petitioner told them that it was decedent's money and she could do what she wanted.

After decedent's death, respondent went to petitioner's office and gave him the bankbook and keys to the safety-deposit box. She believed that petitioner was handling the estate and that he needed the items for probate. In March 1976, respondent met petitioner at the Northwest National Bank where a bank official notified them that both the checking and savings accounts were jointly owned. Respondent said that she knew this.

On cross-examination, respondent testified that approximately $17,000 was transferred from decedent's single account to the jointly-held savings account. She denied that anything was discussed at petitioner's office in March 1973 concerning how the account should be set up; she claimed that at the time she was only asked to have her name put on the accounts. Respondent also stated that she understood the meaning of a joint-tenancy account.

Petitioner was recalled as a witness and testified that he had practiced law since 1956 and denied that he told respondent that if anything happened to the decedent that the accounts would be her property.

During closing arguments petitioner requested the court to take judicial notice of decedent's will that was made in 1969. Apparently the

will bequeathed 25 percent of decedent's estate to respondent. The trial court refused to take judicial notice of the will and held that petitioner failed to overcome the presumption of donative intent.

■■ Petitioner contends that respondent has failed to show, by clear and convincing evidence, a donative intent on the part of the decedent at the time of the creation of the joint tenancy. Moreover, petitioner claims that the joint tenancy accounts were not created with any donative intent on the part of decedent but were established merely for the purpose of convenience. Creation of a joint savings account presumptively establishes the donative intent necessary for a valid gift; one who challenges the existence of the donative intent must present clear and convincing evidence of its absence. (*Murgic v. Granite City Trust & Savings Bank* (1964), 31 Ill. 2d 587, 591, 202 N.E.2d 470, 472.) Thus, petitioner had the burden of rebutting the presumption that a gift was made to respondent.

■■■ In order to determine whether a donor actually intended to transfer his interest in an account at his death to the surviving joint tenant, it is proper to take into consideration the facts surrounding the creation of a joint account and all circumstances and events occurring after the creation of the joint account. (*In re Estate of Schneider* (1955), 6 Ill. 2d 180, 127 N.E.2d 445.) A surviving joint tenant who does not consider himself as having any ownership in an account is a fact to be considered in determining the intent of the creator of the account. (*In re Estate of Guzak* (1979), 69 Ill. App. 3d 552, 555, 388 N.E.2d 431, 433.) Evidence that the transfer was made for the mere convenience of the joint tenant, whose funds are used to create the account, is an indication of lack of donative intent. *In re Estate of Elliott* (1975), 33 Ill. App. 3d 1046, 339 N.E.2d 378; *In re Estate of Weaver* (1966), 75 Ill. App. 2d 227, 220 N.E.2d 321.

In the present case, we are of the opinion that clear and convincing evidence had been adduced at trial to rebut the presumption of donative intent. The record shows that decedent was scheduled for eye surgery and that she wanted someone to help manage her financial affairs while she was hospitalized. It is apparent that respondent was aware decedent wanted her on the accounts to help pay her bills, since respondent's own testimony indicated that her name was placed on the accounts because decedent needed help "with her bank account because of her eyesight." She was paid by petitioner for certain services that she rendered to decedent. This evidence indicates that the transfer was made solely for the convenience of decedent at the time the joint accounts were created. (See *Dixon National Bank v. Morris* (1965), 33 Ill. 2d 156, 210 N.E.2d 505; *In re Estate of Dzialowy* (1977), 53 Ill. App. 3d 585, 368 N.E.2d 780.) There was no showing of any statement by decedent that she wanted the accounts to go to respondent at her death. (See *In re Estate of Dawson*

(1968), 103 Ill. App. 2d 362, 243 N.E.2d 1.) The only statement implying joint ownership of the accounts allegedly came from petitioner, not decedent. Also of importance is the fact that respondent requested several times to be taken off the accounts because of decedent's constant demands that she go to the bank for decedent. This testimony, along with respondent voluntarily relinquishing the bankbook to petitioner immediately after decedent's death, indicates that respondent did not consider herself as having any ownership in the accounts. There is no evidence that respondent ever exercised any authority over the accounts inconsistent with decedent's ownership, nor undertook any course of action in connection with the accounts commonly associated with their ownership by her. See, *e.g.*, *Estate of Kloss* (1965), 57 Ill. App. 2d 118, 125, 207 N.E.2d 92.

■ From the foregoing we find the evidence clearly and convincingly supports the conclusion that at the time of the creation of the accounts decedent intended the respondent to manage her financial affairs for her convenience. In light of our disposition of this case, it is unnecessary to discuss whether the trial court erred in refusing to take judicial notice of decedent's will.

The trial court's order is reversed and the cause is remanded with directions to order the respondent to inventory the joint savings and checking accounts into decedent's estate.

Reversed and remanded with directions.

STAMOS, P. J., and PERLIN, J., concur.